

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-24-00368-CV

———————————————

IN THE INTEREST OF G.J., A CHILD

---

On Appeal from County Court at Law No. 2
Parker County, Texas
Trial Court No. CIV-23-0529

---

Before Womack, Wallach, and Walker, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Drug use, family violence, and the parents' dishonesty led the trial court to terminate the parental rights of I.G. (Mother) and T.J. (Father) to their fourteen-month-old baby G.J. (Max),[1] *see* Tex. Fam. Code Ann. §§ 161.001(b)(2)(D), (E), (2), despite their having supposedly become "clean" during the case and despite each parent's having completed a service plan provided by the Department of Family and Protective Services to help them reunite with the child.

At the trial's conclusion, the trial court acknowledged the case's difficulty and remarked,

> Trials are decided by truth and credibility. And when witnesses can only remember what's convenient to them or what their counsel remind them of, and when witnesses are inconsistent from day one to day three, and when witnesses admit that they lied throughout the proceedings, it's -- puts all of their testimony in question.

The trial court was specifically concerned with Mother's and Father's inconsistent testimonies during the trial, with Father's having taken the batterer's intervention program multiple times before but having "only figured out last year that you're supposed to respect your paramour and walk away from a fight," with Father's family-violence conviction and willful bond-condition violations, with Father's batterers

---

[1]In a termination-of-parental-rights case, we use aliases for the names of the children and their parents. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

intervention class instructor's difficulty recalling details, and with Mother's failing to recall "all the times that [she] went to the hospital and why."[2]

Mother and Father have both appealed, challenging the trial court's finding that termination was in Max's best interest.[3] We hold that legally and factually sufficient evidence supports the best-interest finding and will affirm.

## Discussion

Mother and Father each claim that the trial court's best-interest finding was not supported by legally or factually sufficient evidence. *See id.* § 161.001(b)(2).

---

[2]The child's ad litem attorney, who recommended terminating the parents' rights, noted, "[A]s we've seen over the last few days, we have very inconsistent testimony from Monday to today regarding drug use, regarding domestic violence" and that "it's very, very abnormal to see this overnight change."

[3]In her brief's table of contents, Mother also states that there is legally and factually insufficient evidence to support "that a predicate ground occurred." However, she does not identify which predicate ground, and in the issue and arguments section of her brief, she challenges only the best-interest finding. We thus read Mother's brief as challenging only the best-interest finding. But regardless, most of the evidence that supports best-interest also supports the endangerment finding. As discussed below, the trial court had undisputed evidence that Father used drugs at the home while Mother was pregnant, that both parents used drugs after Max's birth, and that there were multiple incidents of violence between the parents, both during Mother's pregnancy and after Max's birth. *See In re J.S.*, 675 S.W.3d 120, 128 (Tex. App.—Dallas 2023, no pet.) (noting that a parent's drug use or violence may make the child's environment endangering for purposes of Section 161.001(b)(1)(D)); *In re M.S.*, 662 S.W.3d 620, 630 (Tex. App.—Beaumont 2023, pet. denied) (noting that domestic violence may be considered evidence of endangerment under Section 161.001(b)(1)(E), even if the child was not present and was not injured); *see also In re J.W.*, 645 S.W.3d 726, 749 (Tex. 2022) (discussing parents' endangering use of controlled substances during pregnancy).

3

## I. Standard of Review

For a trial court to terminate a parent–child relationship, the party seeking termination—here, the Department—must prove two elements by clear and convincing evidence: (1) that the parent's actions satisfy at least one ground listed in Family Code Section 161.001(b)(1); and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020). To determine whether the evidence is legally sufficient to support a best-interest finding, we look at all the evidence in the light most favorable to the challenged finding to determine whether a reasonable factfinder could form a firm belief or conviction that the finding is true. *Z.N.*, 602 S.W.3d at 545. We assume that the factfinder settled any evidentiary conflicts in favor of its finding if a reasonable factfinder could have done so. *Id.* We consider evidence favorable to the finding if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). If we determine that no reasonable factfinder could form a firm belief or conviction that the Department proved that the termination of the parent–child relationship would be in the child's best interest, then the evidence is legally insufficient. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see* Tex. R. App. P. 43.3.

Under a factual sufficiency review, on the other hand, we review the entire record to decide whether a factfinder could reasonably form a firm conviction or belief that the Department proved the finding. Tex. Fam. Code Ann. § 161.001(b);

4

*In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If the factfinder reasonably could form such a firm conviction or belief, then the evidence is factually sufficient. *C.H.*, 89 S.W.3d at 18–19. But if a factfinder reasonably could not—because the disputed evidence that could not reasonably support the finding is too significant—then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108. Under either standard, the factfinder is the sole judge of the witnesses' credibility and demeanor. *In re J.O.A.*, 283 S.W.3d 336, 346 (Tex. 2009).

## II. Best-Interest Factors

Although we generally presume that keeping a child with a parent is in the child's best interest, *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006), the best-interest analysis is child-centered, focusing on the child's well-being, safety, and development, *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). We consider the evidence in light of the statutory factors that apply in a best-interest determination and the nonexclusive factors set out in *Holley v. Adams*. Tex. Fam. Code Ann. § 263.307(b) (setting out thirteen factors that trial court and Department should consider in determining whether child's parents are willing and able to provide child with safe environment); *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted) (setting out nine best-interest factors); *see In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013).

Some factors may not apply to some cases, and undisputed evidence of just one factor may be sufficient to support a finding that termination is in the child's best interest. *C.H.*, 89 S.W.3d at 27. On the other hand, the presence of scant evidence

5

relevant to each factor will not support such a finding. *Id.* Evidence probative of a child's best interest may be the same evidence that is probative of a Subsection (b)(1) ground. *Id.* at 28; *see* Tex. Fam. Code Ann. § 161.001(b)(1), (2).

## III. Analysis

Mother directs us to evidence that after starting services, she and Father eventually "tested clean" and then—after each relapsed—they remained clean for the rest of the case and completed their service plans. Mother further complains that during her caseworker's testimony, the caseworker "repeatedly substituted her judgment for that of the professionals the parents were referred to for services by the Department . . . [and] repeatedly disregarded any service provider reports of progress by the parents."

Father asserts that even if his testimony and Mother's testimony are excluded, there is no factual evidence that supports termination of their rights as in Max's best interest. He contends that the only evidence the Department presented as to Max's best interest was speculative and in direct contradiction to the facts presented by the Department's own service provider experts.

### A. The Evidence

#### 1. The parents' background information and history together

Mother and Father each provided information at trial about their background, including each parent's family, education, and employment.

6

Mother's father moved to Mexico when Mother was 14. After he left, Mother suffered abandonment issues and started using marijuana from friends. Mother's mother introduced Mother to methamphetamine when she was 19. Mother had not seen her mother in the year before trial and had not seen her brothers in the seven months before trial but occasionally texted them.

In 2022, then-20-year-old Mother began her first serious relationship with Father, who was twice her age, moving in with him two weeks after they met. Both were regular methamphetamine users. Before and after meeting Father, Mother used methamphetamine almost every day. A month after moving in with Father, Mother learned that she was pregnant with Max.

Including Max, Father has at least six children[4]: Kristina, aged 22; Sarah, 20; Seth, 17; Julia, 8; Sydney, 4; and Max. The older three children's mother died in a car wreck in 2010, and Father characterized his relationship with them as "[f]airly good." However, he acknowledged that Kristina had declined to testify on his behalf and that his drug use had caused problems in their relationship. He claimed that Seth had wanted to testify on his behalf in this case but was not old enough. As for Julia and

---

[4]The report of the psychologist who did Father's psychological evaluation stated that Father "reported having a total of 9 children, ranging in age from 9 months to 30 years old." There was no evidence at trial that Father had more than six biological children, but there was some evidence that his deceased former partner had three children from a previous relationship and that those children had lived at least some of the time with Father and his former partner.

Sydney—the youngest children aside from Max—Father had not seen them in several years.

According to Mother, she did not use methamphetamine while pregnant with Max even though Father had continued to use it almost daily. Two weeks after Max's birth in May 2023, Mother resumed her drug use. The parents' drug use triggered arguments although, at trial, Mother only recalled three times when their fights became physical.

One of the physical incidents occurred in July 2023 and involved Mother's being hit in the head with what she described at trial as a decorative candy cane made out of PVC pipe material; at the time, Mother said that Father had hit her, but at trial she and Father claimed that she had accidentally hit herself. That incident resulted in a charge against Father for continuous violence against the family, and the indictment alleged a June domestic violence incident, which Mother claimed not to recall.[5]

The Department put on evidence of two other incidents that had occurred in January 2023, both of which had resulted in Mother's receiving medical treatment. At trial—in contrast to Mother's previous statements to third parties—Mother and Father claimed that in each incident, Mother was the aggressor and Father only hit her after she hit him first.

---

[5]The indictment also alleged that Father had previously been convicted of the felony offense of retaliation against a peace officer.

8

Neither parent graduated from high school, although Father has his GED. The CASA volunteer and Frances Selner, the child's caseworker, both offered Mother resources to help her get her GED, but Mother did not take them up on that offer. In December 2023, Mother got a job cleaning houses. In March 2024, Mother started a job washing dishes at a nursing home. At the time of trial, Father was working as a ranch hand.

### 2. The Department's involvement

The Department put on evidence regarding its initial involvement with Max, its offering Family-Based Safety Services (FBSS) services to the parents, and the parents' violations of their safety plan that led to this child protection suit.

- The Department became involved after the July 2023 PVC pipe incident and set up a FBSS plan under which Mother would have possession of Max, supervised by one of Father's relatives. Luke Schmitt, the Department's investigator, explained to the parents that Mother's contact had to be supervised by the relative and that Father's contact with Max had to be supervised by the Department.

- However, shortly after the plan's implementation, Mother left with Max and her mother, who was not approved to supervise Mother's possession due to a positive field test for methamphetamine. Further, as

Mother admitted to Schmitt, Father violated the plan at least twice by going inside the relative's house.

- In response, the Department changed the plan so that Mother and Max would reside with Mother's aunt, who would supervise Mother's possession of Max. The investigator again made sure that Mother understood the new plan.

- A short time after the plan was changed, the Department was informed that "Mother had left the residence with [Max] and went with [Father]." This action violated not only the safety plan but also Father's bond conditions, as discussed more below. The Department then sought Max's removal.

- The FBSS caseworker and Schmitt tried to contact Mother. When Schmitt spoke to Father for help locating Mother and Max, Father "call[ed] [Schmitt] . . . names" and refused to tell him where they were.

- At some point that day, Mother contacted the FBSS caseworker to tell her that she was at Father's residence. It was unclear whose phone Mother had used because Mother did not have cell phone service at that time, and the residence did not have a landline.

- The FBSS caseworker testified that Mother told her that she did not want to be at the residence but was "trapped there and unable to leave."

10

Mother was there alone, and thus no one was keeping her from leaving, but as discussed below, Mother had limited transportation options. The Department took Max into its care and filed this child protection suit.

### 3. The parents' drug use

The testimony at trial established that both parents became sober during the case, relapsed, and then appeared to become sober again. The evidence also indicated that Father had used drugs off and on for years—since his late teens—with multiple relapses. This was not the Department's first involvement in his life because of drug use. When the mother of his oldest three children was still alive, he had used methamphetamine on the weekends, but after she died in 2010, he started using daily. He became sober in 2014, after the Department "had come into [his] life," and was sober for seven years. There was little evidence admitted at trial about the Department's previous involvement.

Mother claimed that she had stopped using methamphetamine when she learned that she was pregnant, but Father did not stop using drugs while she was pregnant, and she would become angry that he would not give her any. Mother claimed that after Max was born, neither she nor Father ever used methamphetamine with Max in the same room. She stated that Father went to the garage to use it and that he "shower[ed] or clean[ed] up after using." Except for their relapse in November or December 2023, Mother and Father testified that they had stopped

11

using methamphetamine after the Department became involved. According to Father, the relapse occurred on the weekend before his criminal case's court date.

Father testified that he has not consumed alcohol since December 2023, but when asked about his substance use during his psychological evaluation, Father did not report either the November 2023 drug use or his December 2023 alcohol use. Both parents testified about attending AA meetings.

The trial court also heard evidence that Mother and Father had complied with their service plan's requirements regarding drug testing and drug counseling. Selner testified that both parents' drug tests were consistent with their having stopped using drugs. Selner did not order any drug testing for the month and half before trial because she "thought the case would be done by then."

The parents' substance abuse counselor, Monica Kwiatkowski, testified about why they used drugs and her belief that they would be sober going forward.

- Kwiatkowski stated that Father's drug use was triggered by grief over the death of his ex-partner and sense of loss from the "distance with him and some of the kids." She did not discuss what triggered his drug use as a teen, while his ex-partner was still alive, or after his seven years of sobriety that began in 2014.

- As for Mother, she had been exposed to her mother's drug use when she was still a teenager and developed unhealthy coping skills to address her

12

abandonment issues after her father left, such as seeking attention, codependence, and staying in unhealthy relationships. Kwiatkowski said that Mother was able to determine that her triggers for drug use were anger and feeling unimportant.

- For both Mother and Father, Kwiatkowski said that attending meetings, continuing with a therapist, and doing healthy activities all contribute to success.

Kwiatkowski also testified about how drug use can contribute to domestic violence. She stated that methamphetamine use increases dopamine, which causes mood and behavioral changes that can last from hours to days. When the drug starts to wear off, it can cause mood disruption, and people using methamphetamines are more likely to fight.

### 4. Parents' domestic violence and other relationship concerns

It was undisputed at trial that the parents' relationship before the Department's involvement included physical violence, but the parties presented differing versions of how that violence occurred. The Department's version was that Father had physically assaulted Mother, while the parents' version was that Father was only ever violent after Mother instigated the violence against Father or that he merely defended himself. The trial court was thus presented with multiple possibilities based on the evidence: that Father at least sometimes instigated violence against Mother, that

13

Father only ever hit Mother after she first hit him, or that Father only ever defended himself or held Mother back.

Mother claimed that in each violent incident between them, she hit Father first and that he never hit her with anything but his hands. Father also said that he never hit Mother first. But Selner testified that she and Mother had spoken multiple times about violence against Mother by Father and that Mother had never claimed not to be a victim of violence and had never said that Father would only hit her after she hit him. Father had also never told Selner that he was a victim of violence rather than a perpetrator.

Mother testified that she could only remember three times when their arguments turned violent: once in February 2023, once in April 2023, and the July 2023 PVC pipe incident. She did not recall a June 2023 incident that was alleged in the continuous violence indictment against Father. When Father was asked at trial how many times he had "put [his] hands on [Mother]," he referenced Mother's testimony, stating, "[S]he told you. . . . Every time she put her hands on me," which was "probably" more than three times but not more than four. However, he also said, "I know there's times I've hit her . . . but I can't even recall it. I've put it so far out of my mind." As discussed below, the Department put on evidence of two January 2023 incidents that resulted in Mother seeking medical treatment.

14

## a. The July 2023 incident

Mother and Father did not provide details about the February and April 2023 incidents, but multiple witnesses testified about the July 2023 incident.

- Mother testified during the Department's case that she and Father had argued that day after she accused him of cheating and after he refused to give her some methamphetamine. Father tried to leave with Max, so Mother grabbed the candy cane decoration from the yard. She tried to hit Father with it but "ended up yanking it and hitting [herself] in the head with it [and] caused [her]self to bleed." Father then handed Max back to her and left.

- In testifying about the incident for her defense, Mother claimed that she did not remember everything that had happened. She remembered picking up the PVC candy cane decoration, and her wound was in a position where "conceivably [she] could have hit [her]self." In his testimony, Father denied hitting Mother with the object.

- Parker County Sheriff's Deputy Joseph Evans, who responded to a neighbor's call, testified that Mother's demeanor that day was "distraught" and that she had an open wound on her hairline and dried blood "all down her side." He questioned Mother "pretty thoroughly," and she told him that after Father tried to take their child from the

15

residence, she tried to get the child out of the truck, and Father "grabbed some sort of stick object . . . and hit her across the head." She also told him that Father had hit her with his closed fist and did not tell him that she had hit herself. Deputy Evans noticed that Mother also had a scab on her left eyebrow and a bruise on the back of her left arm that she said Father had caused in an incident two weeks before.

- Mother acknowledged at trial that she told law enforcement that Father had hit her, but she claimed that she had made it up.

- Mother also told Schmitt, the Department's investigator, that Father had hit her multiple times and had struck her on the head during the July 2023 incident. Schmitt had several long conversations with Mother over a period of about three weeks, and she never said that she had hit herself during that incident.

- Will Hutcheson, a Parker County Sheriff's Office investigator, interviewed Father about the incident. Father denied assaulting Mother, described the incident as an accident, and said that Mother had accidentally hit herself when he was trying to take the pipe away from her. He also told Hutcheson that he had to defend himself because Mother was a "big gal." Father is 6 feet tall and weighs 280 pounds.

16

## b. Other records of violence against Mother

Some of Mother's hospital records were admitted, and they supported the Department's version of events—that Father was abusive toward Mother and that the parents had been involved in two other incidents of violence, both occurring in January 2023.

- Mother was admitted to the emergency room on January 18, 2023 for a wrist injury. The notes stated, "The patient sustained a crash injury (spouse landed on it). This was a reported assault." Other notes state, "This started last night. (per patient 'my boyfriend & I got into a fight last night & he fell on my arm.' Patient states she contacted PD, but the boyfriend made her leave before [the police] arrived at the home." Notes from a physical assessment state, "The patient has multiple abrasions (neck). Multiple bruises noted (R eye)." In other words, what Mother reported to emergency room staff framed the incident as Father falling on her during an assault, the medical staff observed injuries consistent with assault, and Mother had apparently been concerned enough to call the police.

- At trial, Mother admitted that she broke two bones in her wrist during the fight with Father but framed it as an accident. Father also framed the incident as an accident but was hazy on the details; he said, "I can't

remember the exact incident, but I know we were fighting and I fell. And when we fell, it twisted her arm back and it broke."

- The records also show that Mother was seen in the emergency room on January 25, 2023. Medical notes report, "Patient states boyfriend/father of the baby has been physically abusive since they began seeing each other in August."

- An incident report from Mineral Wells Fire and EMS began with the dispatch to a convenience store for a reported assault and then described how Mother ended up in the emergency room on January 25. When EMS arrived, Mother was on the ground outside the store. Both Mother and a third party reported to EMS that Mother had been assaulted and kicked out of a vehicle:

> Before reaching the [patient], a woman who witnessed the incident told firefighters that she witnessed a man assaulting the woman and then pushing her out of the vehicle before leaving the scene. Once firefighters approached the [patient], she was A&O with no visible signs of trauma. [Patient] stated that her boyfriend had assaulted her after an argument and then kicked her out of-the vehicle. She also stated that she was 21 weeks pregnant with her first child. Primary [patient] assessment found that she had pain in her head, neck[,] and upper back as well as her lower abdomen. [Patient] stated that the boyfriend had put her in a choke hold during the assault and hit her in the head. She also stated that he had kneed her in the abdomen which is why it is now hurting. . . . [patient] was asked about the wrist brace on the right wrist and hand. [Patient]

stated that it was due to a previous assault by the same man.

- At trial, Mother denied that she had ever been pushed out of a vehicle, claimed not to recall the EMS interaction, and stated that she had made up the part about Father choking her. Mother did acknowledge that Father had struck her in the stomach with his knee.

- Father said that he had never pushed Mother out of a car. He did not deny that Mother was taken to the hospital after that incident, but he claimed he could not remember it.

### c. The parents' statements about the violence

The Department presented evidence that Mother had claimed to multiple people that she had been subject to abuse.

- Mother acknowledged that she told two of her brothers and her mother that Father had hit her.

- She made similar statements to the CASA volunteer, to her gynecologist and his staff, to hospital staff, and to Selner. A nurse who works for Mother's gynecologist confirmed that Mother had told her during multiple visits that she was a victim of domestic violence.

- The CASA volunteer testified that a neighbor had commented that "sometimes it went both ways," but until the parents' trial testimony, the

19

CASA volunteer could not recall anyone—including the parents—saying that Mother was sometimes the aggressor in their physical altercations.

- Selner testified that Mother had told her that Father would push her around while she was pregnant. Selner had multiple conversations with Mother, and Mother never said that she was the aggressor. Selner did not believe the parents' story at trial that they were mutually combative, and she noted that Father had domestic violence issues in his past.

The parents presented testimony that, after the Department became involved, they both told people that their fights were mutual and had been caused at least in part by their drug use. Further,

- Father told Dr. Kimberly Booker, who performed Father's psychological evaluation for the Department, that he and Mother had mutually engaged in violence. As discussed below, he also said that to Kwiatkowski and to the instructor of his batterers intervention program. Dr. Booker's report noted that Father had reported a history of domestic violence in his relationship with the mother of his youngest daughters, Julia and Sydney.

- Mother also told Kwiatkowski that she and Father had engaged in "mutually combative behavior" in their relationship and that she would be the one who started their fights. After Father's indictment, Mother

signed an affidavit of nonprosecution. In it, she said that the deputy who had spoken to her about the July 7 incident coerced her into blaming Father.

- Mother claimed that she and Father would get high and then fight but that he never hit her first. And she claimed that she started "[m]ost of" their altercations. There was some evidence of Mother's engaging in violent behavior; the residence had several broken windows, some of which Mother claimed to have broken during arguments. Mother claimed that she had lied about Father's being abusive because she wanted to make him "the bad guy" and that she had continued to lie because she did not want to go to jail.

- Mother acknowledged that her testimony that she did not use drugs while she was pregnant and that she argued with Father only while she was high could not be reconciled with the evidence that some of the violent incidents discussed at trial happened while she was pregnant.

- To explain these fights, Mother's attorney solicited testimony from Kwiatkowski that because of "post-acute withdrawal syndrome," it can take anywhere from six months to two years for a daily methamphetamine user to "level out . . . and become more normal and more of a return to their original personality" after they stop using.

Kwiatkowski testified that even when a person is sober, if the person has not learned coping skills, he or she still might initiate violence.

- Mother testified that she would argue with Father while she was pregnant because she was angry that he continued to use. Mother's attorney also elicited testimony that Mother was not having "[her] best time emotionally" while pregnant because she was experiencing pregnancy hormones and was unhappy about her weight gain.

### d. Mother's isolation by and dependence on Father

Aside from physical violence, the trial court also heard testimony from the Department's witnesses suggesting that Mother has been isolated by her relationship with Father and that she was heavily dependent on Father, as well as testimony from Mother's and Father's witnesses that any isolation by or dependency on him is Mother's choice.

- Mother does not keep in much contact with her mother and brothers. At trial she identified two friends that she had before meeting Father, neither of whom she was in touch with at the time of trial. One of those friends was a friend from high school who used to visit from Graham every few weeks. That friend stopped visiting after Mother moved in with Father, and they had not talked in months before the trial.

- Father's house, where they both live, is "out in the country," and Father works about twelve hours a day most days.

- Before this case started, Mother usually did not have cell phone service, and the house did not have a landline. Mother obtained cell service "[r]ight when CPS started."

- Mother's car stopped working shortly before she met Father, and Mother does not have the money to fix it. The car also had broken windows thanks to fellow drug users who had lived on Father's property for a time. The car had been towed to Father's friend's house, where it remained at the time of trial. However, even if Mother had a working car, she does not have a driver's license. She told Selner that she would get her driver's license but did not; when asked why not, she responded, "Just haven't thought about it."

- In March 2024, Mother got a job washing dishes at a nursing home. Father takes Mother to work in the morning. A woman from their church usually picks her up, but Father picks her up if the woman cannot.

- Mother deposits her paycheck in an account she shares with Father.

- If Mother needs to go somewhere other than work, Father takes her. Father and Mother also attend church and AA together; Mother has

23

never attended an AA meeting by herself. Other than work, Mother does not go anywhere else without Father.

In summary, Mother had been living with Father "out in the country," had no reliable transportation, had no telephone until this case began, was not in much contact with her friends or family, and was alone at the property for up to twelve hours a day. Mother testified that when separated from Father during the case, on a few occasions, one of her brothers gave her a ride somewhere, and she had previously used public transportation. She did not provide any further information about the availability of public transportation where she lived "out in the country" or her use of it, and she also testified that she had missed two visits with Max because of lack of transportation.

However, there was some evidence that Mother had been provided with options to leave Father, if desired. Selner discussed Mother going to a shelter for victims of domestic violence, and Selner offered to drive Mother there if she wanted to go. Mother said that she would consider going, but she never did. The shelter offers help with transportation—Selner testified that she told Mother that the organization could have helped her get her driver's license and get her car fixed—and help with obtaining housing, but Mother was not interested. As of the time of trial, Mother had cell phone service under her own name, which she pays for. She also pays the electric bill for the residence.

The trial court also heard evidence about whether Mother had her own social support network and whether she needed one.

- Father provided Selner with names of people who made up his support network, and Selner did not contact those people to see if they could also be a support network for Mother. However, neither Mother nor anyone else indicated to Selner that the people on that list were also people who would support Mother.

- Selner acknowledged at trial that Mother could meet people at church, AA meetings, and group substance abuse counseling classes. Two ministers from the parents' church testified about providing support for Father, and they both stated that if asked, their church members would also provide Mother with support. Father's employer, who attends AA with Mother and Father, also stated that he would help Mother if she asked for help. And Mother testified during her case that she considered the people in those groups to be not just Father's friends but also hers and that she could contact someone from those groups for help if she needed it.

- Mother testified that she feels that she and Father are equals and that she is free to voice her opinions and free to use the money in their joint account. And their substance abuse counselor testified that she did not

believe that Mother was being isolated by Father and was not concerned that they had developed the same contacts through AA and church.

Even if the people on Father's list would provide support for Mother, Mother acknowledged in her testimony that she had learned in her class for victims of violence about the importance of having contact with family members or having friends "outside of the person you're in a relationship with" and that she did not have that. Selner also testified that she has spoken to Mother about the need to have a safety support network outside of her partner, but Mother never named anyone she could turn to for help who was not connected to Father, and Mother acknowledged at trial that she did not have a support network outside of Father.

The Department also presented evidence that Mother and Father continued to see each other during the case in violation of Father's bond conditions.

- From mid-July 2023 until Father's assault conviction in February 2024, Father was subject to bond conditions that required him to keep away from Mother. They regularly met in violation of those restrictions. Father would instruct Mother to walk a certain distance away from the residence to meet him to avoid detection by his GPS monitor.

- Mother acknowledged at trial that she skipped a supervised visit with Max to spend time with Father.

- Father was charged with violating his bond conditions by going to the residence where Mother was staying, and he was placed on community supervision for that offense in March 2024. After being charged with that offense, he received new bond conditions requiring him to stay 500 yards from Mother, but he continued to see her.

**5. The parents' evidence of a healthier relationship**

Mother and Father also put on evidence, including testimony from Kwiatkowski, to show that they have a healthier relationship now. However, Kwiatkowski's testimony indicated that she did not have the full picture of the parents' history.

- Mother and Father both testified that when they have disagreements, they know to walk away from each other until they have calmed down.

- Mother stated that because of what she learned through her services, she feels like a stronger person now and has no desire to hit anyone.

- The CASA volunteer testified that she had seen no signs of domestic violence between the parents since they became sober. Selner testified that she became concerned at one point that Mother was wearing long sleeves to hide bruises, but Mother learned of those suspicions and showed Selner her arms, which had no bruises.

- Kwiatkowski testified that she saw no indication that either parent was violent when sober. Thus, she believed that without substance abuse, they had a "pretty healthy" relationship. However, Kwiatkowski was not the counselor who had provided either parent with counseling for domestic violence.

- Kwiatkowski was asked about Father's violation of the court order and whether it was important to follow a court order to refrain from contacting someone. She responded that "[i]t can be"; Kwiatkowski believed that Mother would have been homeless unless the court order were violated, but the evidence showed that her belief was not true. Mother had moved in with a relative during the FBSS case, Selner had offered to connect her with a women's shelter, and then Mother had moved back into Father's house while he lived with a friend.

- Kwiatkowski testified that both parents were accountable for their part in the violence between them. But when asked about what Father had said about his part, she reported him saying that he would "hold [Mother] back sometimes" and that he would instigate arguments verbally. She could not recall if he ever admitted hitting Mother.

Andrew Tipton, who taught the batterers intervention and prevention program that Father attended, described the class subject matter, what Father learned in the class, and how Father demonstrated that he has changed.

- Tipton is not a licensed therapist and has no formal education in counseling; his training was through online courses provided to him by his employer.

- Tipton began working with Father in December 2023. Father attended a group class over Zoom.

- Tipton testified that Father was honest about the trauma that he had caused Mother and his children and that around the fourth or fifth week of class, Father had an "[a]-ha" moment when he realized the root cause of his problems and destructive mannerisms. According to Tipton, that root cause was Father's beliefs that men are better than women and that a man's role is being "master of the castle." After that moment, Father showed a change in demeanor, body language, and the way he talked. Father appeared to learn to manage his anger and how to deescalate arguments.

- Father successfully completed the course a month and a half before trial. After completing the course, Father continued to attend classes.

- Tipton sometimes saw Mother in the background of the Zoom sessions, and he never saw any indication that she was fearful and saw nothing that concerned him about their relationship. Tipton did not share the Department's concerns about Mother's being isolated.

- Father told Tipton that most of the domestic violence with Mother was induced by methamphetamine. Father told Tipton that they were mutually combative, but he "never got into any great detail about it." When asked what information Father had disclosed, Tipton could not remember because he saw so many clients and because he had suffered fourteen traumatic brain injuries in the past.

The trial court also heard testimony that Father had already taken a batterers intervention class three times before. Tipton testified that he would not be shocked if Father had to take the class four times for him have an epiphany. Father admitted that he had taken a batterers intervention class in the past—he could not remember how many times[6]—but this time he was more attentive. He believed that he now has the tools to prevent future domestic violence.

---

[6]Father stated that he did not recall taking the class during any other instance when the Department had been involved with his children because any previous Department involvement had involved drugs, not violence. As noted above, other testimony indicated that this case was the fourth time that Father had taken the class.

The parents put on testimony from church leaders to show that they had changed and had the support of a community. William Eudy, who until recently was a minister at the parents' church, testified on their behalf, as did the current minister, Billy Wilson. Both testified about the parents' involvement in the church, and both supported Max's return to the parents.

- Eudy met Father at the church in 2008, when Father was there with someone who was participating in a church program. Father became more involved with the church beginning in June 2022. Since that time, Eudy met Father two to three time a week.

- Eudy met Mother after Max's birth. Eudy stated that Mother and Father have both shown growth, although he did not expand on how Mother had demonstrated growth.

- Father has discussed his life struggles, including anger issues. Eudy began to see changes in Father in the fall of 2023. Eudy stated that he felt like Father is someone he can count on for anything.

- Father also told Eudy about struggling with domestic violence in the past and sought help with that issue, but Father never talked about whether he had ever hit or pushed Mother. Father disclosed his criminal charge for domestic violence against Mother.

- Bill Wilson, the current minister, has been with the church for six months. Wilson has had many one-on-one conversations with Father but none with Mother, although he has seen her converse with others at the church. Wilson said that Father was remorseful for his actions. He also said that Mother did not appear to be controlled by Father and that the church members would be there for either parent if needed.[7]

## 6. Parents' completion of services and other relevant evidence

The evidence was undisputed that the parents completed all their court-ordered services.[8]

The Department put on testimony regarding Max's current placement, and both parties put on evidence about the environment of the parents' residence.

---

[7]Wilson was asked if he would go help Father "[i]f he called up and said, [Mother] just beat me up," to which he replied, "Yeah, but no one's going to beat [Father] up. Look at him."

[8]At some point during the case, Selner had added couple's counseling to the parents' service plans, but she did not file the amended plan with the trial court, and Mother did not sign the plan and was not asked to sign it. Tex. Fam. Code Ann. § 263.103(d) (stating that "[t]he original service plan takes effect when: (1) the child's parents and the appropriate representative of the department sign the plan; or (2) the court issues an order giving effect to the plan without the parents' signatures"); *id.* § 263.104 (providing that an "amended service plan supersedes the previously filed service plan and takes effect when: (1) the child's parents and the appropriate representative of the department sign the plan; or (2) the department determines that the child's parents are unable or unwilling to sign the amended plan and files it without the parents' signatures").

32

- Max is currently placed with Father's cousin and the cousin's spouse. Father stated at trial that he has no concerns about the care that Max is getting in his cousin's home.

- Selner visits Max's placement monthly where he is "doing wonderful." Max is meeting all of his milestones. The foster family has good communication, and the other children in the home treat Max like a brother. The foster parents hope to adopt him.

- The CASA volunteer had no concerns about Max if he stayed in the cousin's home, which was sometimes "a little messy" because it was a busy family of five but was "always clean." The family members "all love [Max], they love each other[,] . . . [and] they seem to get along pretty well."

- As for the parents' home, they had fixed most of the issues pointed out by the Department, including childproofing and an issue with a gas stove. According to Selner, the home still had small pieces of glass in the yard even though Selner had pointed out the problem to Father multiple times. Father claimed he had picked up the glass from the yard the day before trial.

The trial court also heard evidence about the parents' parenting skills and their plans regarding Max.

- Selner stated that during visits, both parents talk to and hold Max and take care of his needs, like changing his diaper. However, Selner also said that when Mother and Father started visiting Max together, Mother did not hold Max very often—"she did more of the cleanup"—and that her bonding with Max appeared to stop.

- The CASA volunteer testified that she did not support a monitored return. She asserted that Mother does not know how to play with Max or engage him or how to soothe him when he is fussy. At visits, Mother would hold him for a minute or two and then pass him to Father. Considering that Father works ten-to-twelve-hour days, the CASA volunteer was concerned with how Max would do left alone with Mother. But she also stated that things had changed "[f]or the better" over time and that she had never seen either parent do anything physically harmful to Max.

- Contradicting the CASA volunteer's testimony, Mother testified that she plays with Max in visits and would continue interacting with him if he were to come home with them. She further stated that Max is happy to see them at visits.

- Father testified that if Max were to be returned to his and Mother's care, he would take a few days off from work to spend with him and then find a day care.

- Regarding Father's relationship with his other children, he testified that he has not seen his youngest daughters, Julia and Sydney, since Father's Day 2022. Both parents claimed that Father does not see them because their mother does not let him. But per a court order, Father was allowed supervised visitation with his youngest daughters. At trial, Father claimed that he did not know about the order until he learned about it during this case. However, Father also stated that the reason he had not seen them was because he had not wanted to be around them while he was a drug user.

### 7. The trial court's findings

At the trial's conclusion, the trial court determined that Mother and Father were not credible, found that Mother and Father had endangered Max, found that termination was in Max's best interest, *see* Tex. Fam. Code Ann. §§ 161.001(b)(1)(D), (E), (b)(2), and ordered their parental rights terminated.

### B. Analysis

We begin by considering the factual sufficiency of the evidence because if the evidence is factually sufficient, it is also legally sufficient. *In re A.N.*, No. 02-22-00036-

CV, 2022 WL 2071966, at *2 (Tex. App.—Fort Worth June 9, 2022, pet. denied) (mem. op.). Applying the evidence to the relevant factors, we conclude that although the parents produced evidence in their favor, clear and convincing evidence supports the trial court's best-interest finding.

We first look at factors that are neutral or against the trial court's finding. Unsurprisingly, given Max's young age, there is no evidence that Max was fearful of returning to his parents' home and no indication that he has any memories of living with his parents, and he was too young to express his desire to live with either his parents or his foster family. Tex. Fam. Code Ann. § 263.307(b)(5); *Holley*, 544 S.W.2d at 371–72 (considering child's wishes in best-interest analysis); *see In re A.P.*, No. 02-22-00180-CV, 2022 WL 16646478, at *10 (Tex. App.—Fort Worth Nov. 3, 2022, no pet.) (mem. op.). Mother testified that Max was happy to see them at visits, but the caseworker and CASA volunteer both testified that Max is happy and doing well in his foster home. Thus, these factors weigh neither against nor in favor of the trial court's best-interest finding.

Father and Mother made improvements to their home to make it safe for Max. *See* Tex. Fam. Code Ann. § 263.307(b)(11) (considering "the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time"), (12)(D) (considering "whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with . . . a safe physical home environment".).

36

Although the caseworker testified that she had seen small pieces of glass in the yard, that was the only remaining uncorrected issue, and the parents had shown their willingness to correct issues in the home. Father and Mother completed all their services except for couple's counseling, which was never officially made part of a service plan. *See id.* § 263.307(b)(10). This evidence weighs against the trial court's finding.

As for plans for Max, Mother and Father testified that they would arrange for childcare and that they had made all the Department's required improvements to their home. *See Holley*, 544 S.W.2d at 372 (considering the stability of the home or proposed placement and the plans for the child by the individuals seeking custody); *see also* Tex. Fam. Code Ann. § 263.307(b)(10) (considering "the willingness and ability of the child's family to seek out, accept, and complete counseling services"). During visits, Father showed some parenting ability, including the ability to play with and soothe Max. *See id.* § 263.307(b)(12)(F); *Holley*, 544 S.W.2d at 372 (considering the parental abilities of individuals seeking custody). This evidence weighs against the trial court's finding.

On the other hand, Selner and the CASA volunteer expressed concerns about Mother's not knowing how to interact with Max, although the CASA volunteer had acknowledged some improvement. If the trial court believed their testimony, then that evidence weighs in favor of the finding, especially considering that the evidence suggested that Mother would be Max's primary caregiver and would be alone with

him for hours at a time on most days. Further, the trial court had evidence about Max's current placement and their hope to adopt him, and that evidence indicated that Max would do well in that home.

The trial court could also consider Father's psychological evaluation. Tex. Fam. Code Ann. § 263.307(b)(6) (considering psychological evaluation of child's parent). The evaluation stated that Father was optimistic, resilient, and adaptive and that he did not have any attitudes toward parenting that were associated with high levels of maltreatment. The evaluation also stated that Father's responses suggested that he has a history of antisocial behavior, had a strong need for attention, and may have been involved in physical aggression toward others.[9] When considered with evidence of Father's violence toward Mother, this evaluation did provide some support for the trial court's finding in that parts of it are consistent with evidence of violence by Father. Mother's psychological evaluation was not offered at trial.

Max's young age makes him especially vulnerable. *Id.* § 263.307(b)(1). There is no evidence that Max was physically harmed by his parents, *see id.* § 263.307(b)(4), but there is evidence of a history of assaultive conduct in their relationship. *See id.* § 263.307(b)(7) (considering "whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home"). Although Mother and Father denied that Father ever hit Mother except when she hit

---

[9]The evaluation stated that Father's legal history included multiple assault charges.

him first, the trial court did not have to believe them. Further, even if the trial court had believed them, that would only mean that both parents had been violent. Mother and Father admitted to three violent incidents, but they claimed not to remember the incident at the convenience store and downplayed the incident that resulted in Mother's broken wrist.

Additionally, Kwiatkowski testified that Father had taken responsibility for his violence against Mother, but that was true only if Father had done no more than instigate verbal arguments or hold Mother back. If the trial court found that Father had been violent against Mother—and it had evidence from which it could make that finding—then the trial court could find that Father had not been honest with Kwiatkowski. If the trial court found that the parents were not honest about the violence between them, it could have further determined that they had not demonstrated the ability to protect Max from exposure to violence. *See id.* § 263.307(b)(12)(E); *Holley*, 544 S.W.2d at 372 (considering the emotional and physical danger to the child now and in the future and the parent's acts or omissions indicating that the existing parent–child relationship is not a proper one).

Mother and Father presented testimony from their substance abuse counselor that their violence was correlated with their drug use and Mother's pregnancy hormones, and the instructor in Father's batterers intervention class believed that Father had changed. But the trial court did not have to give this testimony much weight, especially given that this was the fourth time that Father had taken the class,

39

that Father claimed to not remember taking the class before, and that the trial court had evidence that the parents had minimized the violence between them to the substance abuse counselor. Further, the trial court could have found not credible the parents' testimony that they would not be violent with each other in the future.

Moreover, Mother and Father violated two FBSS safety plans, and, after Max was removed, they violated Father's bond conditions—with Father instructing Mother how they could do that without his getting caught. Some of those violations involved one or both parents being around Max unsupervised when supervision was required *See* Tex. Fam. Code Ann. § 263.307(b)(10) (considering the willingness and ability of the child's family "to cooperate with and facilitate an appropriate agency's close supervision"). Additionally, after Father was caught and criminally charged with violating his bond conditions by being around Mother, he then intentionally violated his bond conditions for that new offense by continuing to see Mother. Given that the parents were willing to risk Father's going to jail and termination of their parental rights to continue seeing each other during the case, the trial court had evidence that they would be unwilling to submit to the Department's supervision under a monitored return or to make Max's needs a priority.

Regarding the parents' social support system, Father provided Selner with a list of people, including fellow church members, who could provide support to the family as needed. *See id.* § 263.307(b)(13) (considering "whether an adequate social support system consisting of an extended family and friends is available to the child"). On the

40

other hand, Mother testified that she did not have her own social support network other than people she knew with or through Father.

Some evidence did indicate that, if Mother had been isolated from her few friends and her family, it was by choice. Mother described herself at trial as a "homebody," and by the time of trial she had her own cell phone service in her name and a job, and she had opportunities to form relationships at church, at AA, and at her job. But other evidence indicated that Mother could be easily isolated by Father. She did not have easy access to her own transportation. She did not have a phone until the case started, and although she pays for her own service, she pays for it out of an account she shares with Father. She could not name any family member or friend not connected to Father with whom she had kept in regular contact since she began her relationship with Father. Outside of the house, she was never without Father except when she was at work. Even if Mother's lack of independence from Father was entirely her choice, that could also be considered by the trial court as concerning behavior because Mother had learned from multiple sources about the importance of having her own social support and because Kwiatkowski had identified codependence as one of Mother's unhealthy coping skills for her feelings of abandonment. Under the specific circumstances of this case, the trial court could have considered as relevant to Max's best interest the fact that Mother did not appear to have resources or support independent of Father, even after being told that, given her circumstances, having that support was important.

In summary, the trial court could have decided that it was irrelevant who started the violence between the parents because, either way, the parents minimized Father's participation in it despite Mother's multiple hospital trips. Neither parent fully explained how Mother had broken her wrist or explained the statement of an eyewitness who had said that Father had assaulted Mother and then kicked her out of the car at the convenience store; they instead denied that it had occurred or claimed not to remember it. They provided no explanation for bruises that third parties had seen on Mother. Further, the trial court did not have to believe that the PVC pipe incident was accidental or was caused by Mother. Additionally, multiple incidents of violence occurred while Mother was pregnant. And the trial court had evidence that Father had been through a batterers intervention program before, meaning that he had had issues with domestic violence in at least one previous relationship and had received treatment for it, but he still engaged in violence with Mother. That is, when all of the evidence was considered together, the trial court could have determined that Father was abusive, that Mother was overly deferential to him despite that abuse, and that Mother was unwilling or unable to protect herself or Max from future violence. The trial court could consider these circumstances in deciding whether the parent–child relationship was proper.

The trial court also had evidence of the parents' history of substance abuse, including Father's long-time use and repeated relapses. *See id.* § 263.307(b)(8) (considering "whether there is a history of substance abuse by the child's family or

others who have access to the child's home"); *see also In re S.Q.-M.B.*, No. 04-24-00296-CV, 2024 WL 3882144, at *4 (Tex. App.—San Antonio Aug. 21, 2024, no pet.) (mem. op.) ("Illegal drug use is relevant to multiple best interest considerations, . . . including a child's emotional and physical needs now and in the future, a parent's parental abilities, stability of the home, and a parent's acts or omissions pertinent to determining whether the parent-child relationship is improper.").

The parents' apparent sobriety for the approximately eight months before trial is commendable and was relevant evidence for the trial court to consider. *See In re D.T.*, Nos. 07-19-00071-CV, 07-19-00072-CV, 2019 WL 3210601, at *8 (Tex. App.—Amarillo July 16, 2019, no pet.) (mem. op.) (stating that father's sobriety for more than a year before trial and absence of witnesses expressing concern over a possible relapse weakened inference drawn from father's past drug use that he would relapse in the future). But given Father's long-term drug use and his relapse after a long period of sobriety—and his admission of previous involvement with the Department because of his drug use—the trial court could consider Father's past drug use as evidence that termination was in Max's best interest. *See In re H.L.H.*, No. 10-16-00254-CV, 2018 WL 1321750, at *19 (Tex. App.—Waco Mar. 14, 2018, no pet.) (mem. op.) (noting that evidence of past misconduct can be used to measure a parent's future conduct); *In re M.L.G.J.*, No. 14-14-00800-CV, 2015 WL 1402652, at *7 (Tex. App.—Houston [14th Dist.] Mar. 24, 2015, no pet.) (mem. op.) (noting that a

parent's continuing illegal drug use after a child's removal is conduct that may be considered as establishing that termination is in the best interest of the child).

As for Mother, she claimed that she had stopped using drugs while pregnant, but soon after Max's birth, she began using again, and she stopped using after the Department became involved but then relapsed several months later. Thus, although her drug use history is not as long as Father's, she has had two relatively recent relapses after periods of sobriety. The trial court could consider the possibility of her relapse in the future, especially given that Mother lives with Father, who also has a history of relapses, and that the parents claimed that their violence was spurred by their drug use.

Additionally, Father claimed that he had not wanted to see some of his children because he did not want to be around them while using drugs, but he did not seek help for that drug use so that he could see those children again. He used drugs during Mother's pregnancy and continued to use drugs while living with Max, indicating that he had prioritized his drug use over his children.

As for Mother, though she claimed that she had not used while pregnant, she chose to live with Father, who was using, despite the fact that—according to both parents—their drug use made them prone to violence. *See Holley*, 544 S.W.2d at 372 (considering child's emotional and physical needs and the emotional and physical danger to the child, now and in the future); *see also In re N.J.H.*, 575 S.W.3d 822, 834 (Tex. App.—Houston [1st Dist.] 2018, pet. denied) ("A factfinder may afford

44

great weight to the significant factor of drug-related conduct."). Even if Mother managed to stay sober, there was evidence that Mother prioritizes Father over Max, and thus the trial court could consider the real possibility that Mother would choose to stay with Father if he relapsed, just as she had stayed with Father while he continued using during her pregnancy. The parents' drug use supports the trial court's finding.

It was the trial court's role as factfinder to weigh the witnesses' credibility and to resolve conflicts in evidence, and we may not substitute our opinion for the trial court's. *See In re P.M.*, No. 02-23-00365-CV, 2024 WL 976819, at \*5 (Tex. App.—Fort Worth Mar. 7, 2024, pet. denied) (mem. op.). Applying the appropriate standard of review, the parents' evidence against the trial court's best-interest finding is not so significant that a reasonable factfinder could not have formed a firm belief or conviction that termination was in Max's best interest. Accordingly, the evidence is factually sufficient to support the trial court's best-interest findings, and, consequently, the evidence is also legally sufficient to support the findings. We therefore overrule each parent's issue.

## Conclusion

Having overruled each parent's issue, we affirm the trial court's judgment.

45

                                                        /s/ Mike Wallach
                                                        Mike Wallach
                                                        Justice

Delivered:  February 6, 2025